BREYMANN et al. v. FORE RIVER SHIPBUILDING CO.

(District Court, D. Massachusetts. July 12, 1909.)

No. 77.

SHIPPING (§ 81*)—LIABILITY OF VESSELS—INJURY TO MOORED SCOW BY SWELL FROM PASSING VESSEL.

A dredge, engaged in deepening the main channel into Boston Harbor, was left anchored in the channel on a holiday, when not at work, with a scow made fast to her south side by lines. No one was on the scow, and no one on the dredge was giving her any attention. During the day the battleship Vermont came in from a trial trip made by the builders, and, passing to the south of the scow at a distance of about 200 feet, her swell caused the scow to break her lines and she drifted ashore and received some injury. *Held* that, while it was the duty of the Vermont to use reasonable care to avoid injury to the scow and dredge by her swell, which, owing to her construction, was unusually heavy, she was entitled to use the channel, and under the evidence, it did not appear that she failed in such duty, her speed having been reduced as much as was safe, having reference to her draft and the state of the tide, which was ebb and nearly out, and that she was not liable for the injury to the scow, which under the circumstances, and considering that her lines were old, should not have been left with no one in charge.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. § 345; Dec. Dig. § 81.*

Liability of vessel for injuries caused by creation of swell, see note to The Asbury Park, 78 C. C. A. 3.]

In Admiralty. Action by George H. Breymann and others against the Fore River Shipbuilding Company to recover damages for injury to scow. Libel dismissed.

Blodgett, Jones & Burnham, for libelants.
Bingham, Smith & Hill, for respondent.

DODGE, District Judge. The libelants' dredge Boston was being employed by them in dredging work in Boston Harbor under a government contract. On Thursday, November 29, 1906, she was moored at a point about midway in the main ship channel of Boston Harbor, below Castle Island and above Spectacle Island, on one side of the channel, and about opposite the lower end of the Lower Middle shoal on the opposite side. Thursday, November 29th, was Thanksgiving Day, on which active work was suspended. The only men on board the dredge were the engineer and two firemen and a deck hand, who were spending most of their time below. The libelant's scow No. 11, one of the scows into which, when dredging was going on, the material dredged was dumped in order that it might be towed away, was lying alongside the dredge, partly loaded. She had been placed there on the day before to be in readiness for the tugboat, which would take her to the dumping ground on the morning after, and also in order that she might meanwhile be kept pumped out by a steam pump on board the dredge. There was no one on board her.

The dredge was 115 feet long and 40 feet wide. As she lay moored, she was headed down the channel and parallel, or nearly so, to its gen-

eral direction. The scow was alongside on the southerly or starboard side of the dredge, attached to her by three 6-inch lines, one of them doubled. The scow was 140 feet long and 40 feet wide. She projected in the direction down the channel 10 or 15 feet beyond the dredge. At about 4 o'clock in the afternoon the battleship Vermont, which the defendant company had just completed under a contract with the United States, came up the harbor on her return from a trial trip. The government authorities had not yet accepted her, and she was being navigated by employés of the defendant company, to which she then belonged. She passed the dredge and scow at about 4 o'clock, going to the southward of them at a distance of not over 200 feet from the scow when at the nearest point. The tide was still running out at the time, but it was only about half an hour before low water. The wave or swell created in the channel by her passage caused the scow to part the lines which attached her to the dredge, and the scow then drifted down the channel and went ashore on Spectacle Island. The libel seeks to recover for the damage she sustained by being thus stranded.

The Vermont's dimensions are: Length, 420 feet, and about 76 feet beam. She was drawing 24½ feet, and her displacement was about 16,000 tons. The passage of so large a vessel inevitably creates a considerable wave or swell, and the Vermont's model is such as to cause her to create rather more disturbance and suction in the water than most vessels of like dimensions. The less the depth of water, the more noticeable is the disturbance and suction. There was, therefore, more of it on this occasion than there would have been, had the tide been higher. There was nothing to prevent the dredge and scow being seen from the Vermont as she approached them.

That it is the duty of a steamer to use reasonable care to prevent the swell or suction caused by her passage from injuring moored or anchored vessels near which she has occasion to pass has been repeatedly decided and is not disputed. The Vermont is claimed to have failed in this duty in several respects, which I next proceed to consider.

She is charged with having passed the dredge and scow at an undue rate of speed, such as augmented the danger to other vessels from her swell or suction. There is evidence on the scow's behalf that the Vermont passed at a rate of 10 miles an hour or more; but on the whole evidence I find that she had slowed down immediately upon sighting the dredge and scow, and when at an abundantly safe distance from them, from her full speed of 17 knots, or thereabout, to a speed of not more than 5 or 6 miles per hour; also that she did not increase that speed until after she had passed through the narrow part of the channel and come out of it into the upper harbor, a long way above the dredge. I find, also, that she could not, at low water and with the tide ebbing against her, have been run in that part of the channel at a rate materially slower than that at which she passed the dredge without risk to herself. I cannot believe that there was any such occasion for apprehending danger to the scow as to call upon her to anchor. I think she had a right to proceed through the channel, and that, if she was to do this, it would not have been safe to stop her engines, even temporarily. Her draft required, not only that she be kept in the channel, but that proximity to the channel limits or to the shoal spots in the

channel be avoided by a safe margin, and for this purpose steerage way was necessary. She could not have been permitted to drift without risk. Excessive speed on her part, therefore, is a charge which, in my opinion, has not been sustained.

She is charged with having gone to the southward of the dredge and scow, when by going to the northward of them the dredge would have protected the scow from the force of her swell. The evidence is that, of the steamers that had passed while the scow had been lying there, nearly all went to the northward of the dredge, and it is claimed that the Vermont was not following at that point the usual course for steamers. It appears, also, that the deepest water in the channel at that point, and for some distance above and below it, was in fact to the northward of the dredge. The libelants were undertaking to deepen the channel to a uniform depth of 35 feet for a width of 525 feet. They were to make 15, and had made 10, cuts in the bottom of the channel to that depth, each cut 35 feet wide, and the dredge was then anchored upon the eleventh cut, which had been partly completed. All the completed cuts were to the northward of where the dredge lay, so that 350 feet of 35-foot water extended northwardly from her. I find, however, that the completion of the cuts referred to had not been in any way publicly announced and was not generally known; also that the respondents' employés in charge of the Vermont did not know about it, and could not reasonably have been expected to know about it. Without such knowledge, and judging by the depths shown on the charts then in use, there was about the same room in the channel available for the Vermont to the southward as to the northward of the dredge and scow. The course to the southward, however, was the one indicated by those ranges from objects on shore upon which navigators were accustomed to rely, and the one best calculated to avoid danger from shoal spots in the channel a little further up, toward which a course to the northward would have headed the Vermont. I am unable to hold that reasonable care toward craft thus constituting in fact an obstruction nearly in midchannel (though not an unlawful obstruction), as the dredge and scow undoubtedly did, required the battleship to pass on one side of them rather than on the other.

The Vermont is charged with having gone too close to the dredge and scow. If, as appears to have been the case, the swell inevitably created by her passage was known to be considerable, even at the slow rate of speed adopted, and to be in any case greater than would be created by most other vessels of like draft, and to be particularly great at low tide; and if, as must have been obvious, the scow was lying unsheltered in any way from its effects, it may be said that reasonable care required the Vermont to keep as far away from the scow as she could with due respect for her own safety. No witness on either side has undertaken to estimate the distance at which she passed at more than 200 feet at the nearest point, and according to the charts there was room enough to permit a vessel even of the Vermont's draft to give the scow a berth considerably wider than this. In view, however, of the importance to the Vermont of not getting out of her course as she approached the entrance to the narrowest part of the channel immediately

above, I do not think it is satisfactorily shown that she could materially have increased the distance between herself and the scow in passing, with due regard for her own safety. Unless the distance was to be very materially increased, I see no reason to believe that it would have made any difference in the result so far as the scow was concerned. I am unable, on the whole, to charge the Vermont with any negligence in this respect.

Whether there was reasonable care or not on the Vermont's part, in the above respects or in any respect, must to a great extent depend upon what the persons in charge of her were bound to anticipate as the consequences of their navigation past the scow, and this would include more or less risk of injuring the scow in proportion as precautions had or had not been taken on board the scow to guard her against the peculiar dangers of the place she occupied. They were not bound to anticipate consequences which adequate precautions would have prevented. Clearly the owners of the scow would have no right to impose upon all craft having occasion to use this, the only deep-water, entrance to the harbor the sole burden of avoiding injury to her. The cases in which steamers have been held responsible for damage to other craft moored or at anchor, by the swell created in passing them, have generally been cases in which the damaged vessel was at a wharf or dock, or at some point of the shore out of the channel, where her regular business might well require her to be. If it was necessary for the dredge to be in the middle of this channel, it can hardly be said that it was necessary for the scow to be there. The evidence is that she had to be kept pumped out while partially loaded, as she was, and that this was one reason why she had been kept during the holiday alongside the dredge, in preference to taking her to an anchorage ground out of the channel. While it may not be possible to say that it was unlawful or necessarily negligent thus to leave the scow in midchannel, I think it must nevertheless be true that when her owners, for their own convenience and advantage, thus left her where she must unavoidably increase the dangers and difficulties to be encountered by other vessels in navigating this always somewhat dangerous and difficult portion of the channel, they did so to a considerable extent at their own risk, and must show that precautions were taken by them commensurate with the dangers to which they thus exposed her, before they can assume to charge other vessels lawfully navigating the channel with negligence. They were bound to see to it that the scow's mooring ropes were adequate for any emergency of this kind which might arise, and to have some one constantly on watch to act as emergencies of this kind might require, as by slackening the mooring ropes, if sudden strain could be thus avoided, or by giving signals of some sort to aproaching vessels that special caution was needed. De Lelle v. The Atlanta (D. C.) 34 Fed. 918, 919. They had in this case taken no such precautions whatever. No one was on board the scow, the men on the dredge were keeping no lookout, and did not find out that the Vermont's swell was likely to reach the scow until it did reach her. Nor are the scow's mooring ropes shown to have been such as ought to have been used under such circumstances. According to the evidence they parted

easily and readily at the first strain put upon them, and I think the evidence shows that this is the result which ought to have been anticipated in view of their age, the use to which they had been put, and the usual life of ropes so used. An attempt was made after the scow broke adrift to get a line to her, but only one small rowboat had been provided for the use of the dredge and scow, and the attempt failed for want of a proper boat or sufficient men. Had these been at hand, as I think they ought to have been, the scow need not have gone ashore. The libelants' neglect seems to me to have been such as prevents any issue which the evidence leaves at all doubtful from being determined in their favor.

The evidence seems to me insufficient to establish any negligence on the Vermont's part as the cause of damage to the scow, and I must therefore dismiss the libel, with costs.